Kevin W. Coleman (CSBN 168538)
kcoleman@schnader.com
Todd B. Holvick (CSBN 257784)
tholvick@schnader.com
SCHNADER HARRISON SEGAL & LEWIS LLP
650 California Street, 19th Floor
San Francisco, California 94108
Telephone: 415-364-6700
Facsimile: 415-364-6785

Proposed Attorneys for
SILICON GENESIS CORPORATION
Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>SILICON GENESIS CORPORATION,<br><br>Debtor<br><br>EIN: 77-0459246 | Case No.: 15-50525 MEH<br><br>Chapter 11<br><br>**DECLARATION OF THEODORE E. FONG IN SUPPORT OF FIRST-DAY MOTIONS**<br><br>Date: February 26, 2015  *[Requested]*<br>Time: 10:30 a.m.  *[Requested]*<br>Place: U. S. Bankruptcy Court<br>280 South First Street, Courtroom 3070<br>San Jose, CA 95113<br>Judge: Hon. M. Elaine Hammond |

I, Theodore Fong, declare:

1. Silicon Genesis Corporation ("SiGen" or "Debtor"), is a California corporation formed in 1997. I serve as the Debtor's President and Chief Executive Officer and have served in that capacity first as interim since November 2012 and subsequently as full time since January 2013. Prior to assuming the role of SiGen's President and CEO, I acted as its Vice President and COO, and Vice President and CFO. Except as otherwise noted, I make this declaration based upon my own personal knowledge. If called as a witness, I could and would competently testify hereto.

2. As the Debtor's President and CEO, I am the custodian of all records maintained in the ordinary course of SiGen's operations. I am therefore familiar with the manner in which SiGen has maintained its business records since September 1999. To the extent the testimony reflected below is based upon my review of such records, I can state that: (a) the record was made and kept in the course of regularly conducted business activity, (b) the record is one that is routinely made and kept in the course of business, in the business's usual practice, (c) the record was made at or near the time of the event that it records; and (d) the record was made by a person with knowledge, or from information transmitted by a person with knowledge, and who reported such knowledge in the regular course of business.

## I. General Background

3. SiGen was formed as a research and development company focused on materials used in semiconductor chips. Among other things, SiGen pioneered a "thin-film" room temperature lamination process technology to produce materials such as silicon-on-insulator ("SOI") wafers that continues to be used by major integrated circuit manufacturers today. In essence, SOI uses hydrogen ions to "slice" layers as thin as 1 micron of silicon from the top of a donor silicon wafer, bond that "slice" to another handle substrate, and peel it off the layer from the donor silicon wafer. One key advantage of SiGen's process is that it allows the silicon's crystalline structure to remain intact, and thereby enhance the utility and efficiency of the chips produced from the SOI wafer. A technology enhancement developed by SiGen allows thicker (20-150 micron) "slices" of silicon to be cleaved from a silicon brick, which can then be used in a variety of other applications such as photovoltaic ("PV") solar cells, sapphire-laminated-onto-glass displays for smartphones, and silicon carbide wafers for high powered circuits. Another area in which SiGen has begun to innovate facilitates the manufacture of three-dimensional integrated circuits ("3DIC") that will enable the stacking of thin layers of integrated circuits, the next frontier in the development of higher speed and higher capacity chips. SiGen holds roughly 135 patents issued in the United States, plus others issued overseas, and it has licensed its inventions to a number of industry leaders including SunEdison, Shin-Etsu Handotai (the world's largest silicon wafer supplier), EV Group E.Thallner GmbH, and Applied Materials.

Schnader Harrison Segal & Lewis LLP
650 California Street, 19th Floor
San Francisco, CA 94108-2736
Telephone: (415) 364-6700
Fax: (415) 364-6785

4. Since its founding, SiGen raised over $130 million in venture capital and grew to employ approximately 85 employees by 2008. Beginning in 2010, however, SiGen began to experience financial stresses attributable to three primary causes. First, the company's revenues were impacted by the significant downturn in the market for PV solar cells. Second, technological innovation by competitors and changing customer demands affected revenues generated by SiGen's development projects and product lines, while at the same time, SiGen continued to incur significant R&D expenditures to develop its next-generation technologies.

5. As described more fully below, to provide additional working and investment capital, SiGen entered into a series of financings with Firsthand Technology Value Fund, Inc., Convexa Capital VIII AS, Convexa Capital IX AS, and PV Capital AS (collectively, "Firsthand" or "Lender). At the time these advances were made, it was contemplated that they would be converted into equity in connection with a seventh round of investment financing expected to occur when SiGen's solar technology was ready for market. The original maturity dates of these loans were set based upon the expected closings of that equity financing.

6. Delays in completing product development and to some extent weakness in the general economy meant that SiGen was not able to fully commercialize its new technologies and secure the additional equity financing, so the Firsthand advances were not converted to equity. In order to conserve cash while continuing to develop solar and other technologies, SiGen began reevaluating its strategy and began intensive cost reduction efforts which led to a restructuring plan in late 2012 aimed at reducing its operational costs, liquidating non-essential assets, and reducing its liabilities. Over the last two years, SiGen has also been focused on developing new business opportunities that now include the assertion of intellectual property infringement claims, new material development with a key partner, and 3DIC.

7. With respect to cost reduction efforts, SiGen reduced its headcount, and vacated its former R&D facility and administrative offices on Baytech Drive in San Jose, which was completed on December 31, 2014. As part of the restructuring, SiGen agreed to spin off to a new company called QMAT certain assets related to the development of a new wafer material

for use in a very high value high growth market. Since January 2015, SiGen operates its business out of a facility it shares with QMAT.

8. As a result of these operational changes, SiGen has reduced headcount and other operational expenses significantly, paid down non-insider trade debt, and paid approximately $1 million to Firsthand in the last 90 days.

**A. The Debtor's Pre-Petition Credit Facility**

*(1) Summary of Material Terms*

9. As noted above, SiGen entered into series of financing transactions with Firsthand to provide additional operating capital. Firsthand first advanced $1,250,000 in November 2010. Another $500,000 was advanced in October 2011, $1,000,000 in February 2012, and $3,000,000 in December 2012. True and correct copies of the November 3, 2010 Secured Convertible Note Purchase Agreement and related documents are attached hereto as **Exhibit A**. True and correct copies of the October 13, 2011 Secured Convertible Note Purchase Agreement and related documents are attached hereto as **Exhibit B**. True and correct copies of the February 4, 2012 Secured Convertible Note Purchase Agreement and related documents are attached hereto as **Exhibit C**. True and correct copies of the December 14, 2012 Secured Three Year Term Note Purchase Agreement and related documents are attached hereto as **Exhibit D**. The documents attached hereto as Exhibits A through D are hereinafter collectively referred to as the "Pre-Petition Loan Documents." There was also a very short bridge loan in the amount of $500,000 made in November 2012, which was paid off in December 2012.

10. The November 2010, October 2011, and February 2012 Agreements all provided that interest would accrue on the advances at the rate of 20% per annum, compounded monthly. The Pre-Petition Loan Documents further provided that the November 2010, October 2011, and February 2012 advances were due and payable at earlier dates, but pursuant to a series of amendments, the maturity date on each was extended to December 31, 2014. As noted above, it was explicitly contemplated that the advances would be converted when additional equity capital was raised.

4
PHDATA 5234260_1
Case: 15-50525  Doc# 19  Filed: 02/20/15  Entered: 02/20/15 16:03:56  Page 4 of 14

11. The December 2012 Note Purchase Agreement provided for interest payments at the rate of 10% per annum, payable monthly, and for repayment of principal on December 31, 2014. On January 1, 2014, the loan interest rate was increased to 12% per annum after the principle amortization was delayed from starting on January 1, 2014 to starting on January 1, 2015. The December 2012 Note Purchase Agreement further required SiGen to enter into a royalty sharing arrangement under which SiGen was obligated to pay to Firsthand 10% of all of the license revenues it received (except for certain license fees paid by QMAT, Inc.). *See* Recitals to December 14, 2012 Note Purchase Agreement, attached hereto as Exhibit D. None of the payments SiGen made to Firsthand pursuant to the royalty sharing agreement reduced any indebtedness Firsthand asserts is owed under any of the Pre-Petition Loan Documents.

12. The advances made by Firsthand purport to be secured by substantially all of SiGen's assets, including all of its intellectual property, accounts receivable, equipment, payment rights, cash, and commercial tort claims. Firsthand recorded UCC-1 financing statements with the California Secretary of State on November 5, 2010, January 10, 2012, and February 10, 2012. True and correct copies of the UCC-1 financing statements are attached hereto as **Exhibit E**.

13. Consistent with the underlying security instruments, each of the recorded UCC-1s explicitly excludes assets formerly subject to a security interest held by J.D. Molex One, LLC ("Molex Equipment"). The Molex Equipment consists of equipment used in R&D operations, which is described more fully in the Facilities/Landlord Equip. section of the asset list attached hereto as **Exhibit F**.

14. While the Pre-Petition Loan Documents purport to grant Firsthand a lien on commercial tort claims, none are specifically identified in the security documents.

*(2) Summary of Payments to Firsthand*

15. From November 2010 to date, SiGen has paid Firsthand $1,000,000 in purported principal, $1,132,919.26 in interest, and $521,852.23 in royalty participation payments.

16. By my calculation, under the terms of the Pre-Petition Loan Documents, SiGen owes $7,688,182.09 to Firsthand as of February 28, 2015, consisting of $5,750,000 in purported principal, and $1,938,182.09 in interest.

*(3) Grounds to Dispute Firsthand's Claimed Indebtedness*

17. As discussed in paragraph 7, in December 2012, SiGen spun off a company named QMAT that secured an exclusive license to use its layer transfer technology for a new wafer material in a high growth lucrative market. Firsthand acquired substantially all of the equity interest in QMAT, and as agreed by the SiGen Board of Directors, SiGen received no consideration in exchange for the transfer of its ownership interest in the other assets except for a forward royalty for ongoing revenue opportunity represented by the QMAT technology. Firsthand funded QMAT so that it could purchase a license from SiGen. That license, however, gave QMAT exclusive rights and a technology base to start from for product development and without which it could not operate. The license fee was set at a fair market price for the value of the license rights conferred. Thus, as a result of the December 2012 transaction, QMAT's equity ownership is now predominantly held by Firsthand, none by SiGen, and SiGen received no additional consideration besides the fair market value of the exclusive license for the transfer of those equity ownership rights.

18. Firsthand Capital Management, Inc. ("Agent") acts as the agent for Firsthand and the other purchasers of convertible notes in the 2010 and 2012 transactions. At the time each of the Firsthand financings occurred, Kevin Landis served as the President of both the Agent and Firsthand Technology Value Fund, Inc. For several years prior to the Firsthand financings, Mr. Landis was also a member of SiGen's board of directors, and he continues to serve on SiGen's board to date. After Firsthand began making advances to SiGen, the board relationship with Kevin Landis began to change because of Firsthand's added role as a lender to SiGen. These dynamics became more apparent as the SiGen board needed to make strategic decisions in other areas. In my opinion, Firsthand's role as a lender became more predominant as the basis for making or not making decisions on significant strategic matters for SiGen. According the records in the SiGen board meeting minutes, as the conflict of interest became more manifest,

Mr. Landis would recuse himself from a number of important board votes based upon advice from Firsthand's counsel not to attend.

19. With the realization that the Firsthand notes would soon be due if not extended, I continued to seek other opportunities to raise capital for operations and to repay Firsthand. In late 2012, SiGen obtained a proposal from a partner of Silicon Valley Bank to make a $3,000,000 term loan at a rate of only 10% interest – terms far more favorable than the 20% interest on the Firsthand loans outstanding at the time. In my opinion, Mr. Landis used his influence on the board and leverage created by the then-imminent maturity of the outstanding Firsthand loans and unwillingness to yield on Firsthand's senior lien position on all of SiGen intellectual property and other assets to prevent SiGen from pursuing a loan from this third party lender or any other lender. In addition, in early 2014, SiGen was prepared to retain one of the nationally known major name brand IP assertion firms for a full contingency pursuit of our IP infringement claims. That law firm, however, requested that Firsthand grant a waiver of possible foreclosure on the IP and assets of the company on December 31, 2014 when the loans were due. Although a series of negotiations took place, SiGen and Firsthand were unable to agree to the terms of a waiver, and as a result, the revenue opportunity presented by the IP assertion strategy has been delayed by nearly a year.

20. The security agreement entered into in connection with the December 2012 advance provides that it secures only obligations under the notes, and other fees and costs incurred by Firsthand in the event of default. *See* December 14, 2012 Security Agreement, ¶1(j), attached as Exhibit D. The November 2010, October 2011, and February 2012 Note Purchase Agreements all contain identical provisions concerning the obligations secured, and confine the grant of a security interest thereunder only for the repayment of the obligations due under the respective notes. *See* November 3, 2010 Secured Promissory Note Purchase Agreement, ¶2.1, attached as Exhibit A. Hence, SiGen's obligation to make payments to Firsthand under the Royalty Participation Agreement is not secured by any of its assets. In the ninety (90) days prior to the filing of this case, SiGen made $35,922.81 in royalty participation payments to Firsthand.

In the one year prior to the filing of this case, SiGen paid Firsthand $459,118.48 under the Royalty Participation Agreement.

**B.  SiGen's Proposed Use of Cash Collateral, Assets, and Adequate Protection**

*(1)  Proposed Use of Cash Collateral*

21. I have prepared a 13-week cash flow forecast detailing expenditures necessary to preserve and enhance the value of SiGen's assets for all stakeholders, a true and correct copy of which is attached hereto as **Exhibit G**. From now through March 31, 2015, the budget proposes to expend $244,146.00. These expenditures consist of payroll and other employee benefits, storage facility rent, utilities, corporate legal fees, patent maintenance and prosecution fees, engineering consulting fees, and costs to install certain equipment necessary to continue development of SiGen's 3DIC and other technologies described in the paragraph immediately below. For the remainder of the 13-week period (through May 31, 2015), SiGen will be required to expend an additional $283,242 for these same cost categories, and pay an estimated $1,950 in fees due under 28 U.S.C. § 1930(a)(6). The aggregate expenditures for the first 13-week period therefore total an estimated $527,388.

22. The budget contemplates making expenditures related to the installation of what is referred to as R&D4 equipment, which includes the following:

    A.    1.1 MeV linear accelerator implanter,

    B.    a high energy beam transport, and

    C.    an end station used to hold wafer targets such as an integrated circuit CMOS ("IC-CMOS") device wafer, a Sapphire material wafer, or a Silicon Carbide material wafer.

23. In addition to the installation of the R&D4, the proposed budget seeks authorization to expend $50,000 per month to develop the process feasibility for 3DIC, Sapphire and Silicon Carbide products.

24. In my opinion, it is crucial that SiGen be permitted to make expenditures to continue to develop these "next generation" technologies. The field of 3DIC is being addressed by major companies such as Micron with its "cube" memory that has four layers of stacked IC-

CMOS to form a higher density memory chip.  Samsung is also a pioneer of stacked device layers used in the development of memory devices.  SiGen's 3DIC layer transfer technology if proven feasible would dramatically improve the efficiency and reliability of IC-CMOS, which would be a springboard for a significant new source of license revenue.

25. In addition, the R&D4 system is also used for the development of Sapphire and Silicon Carbide layer transfer applications. A key licensee is very interested in developing these two material applications, and has discussed with me the possibility of purchasing equipment from SiGen to facilitate this application for up to $5 million.  This licensee has also discussed entering into a 12 to 18 month joint development agreement with SiGen, which would include payment of approximately $1 million to SiGen.  If the technology proves to be viable, there is a very high probability the licensee will enter a new license for SiGen's layer transfer technology to make Sapphire layer transfer materials, which are used in several electronic devices including smartphones, and Silicon Carbide layer transfer materials used in high power electronics.  This licensee told me in December 2014 that it was prepared to enter into agreements with SiGen along the foregoing lines and several drafts of a memorandum of understanding were prepared. Although senior management submitted the entire MOU proposal for executive management approval, while there was agreement on the equipment purchase portion and price of the proposed deal, we could not finalize the terms for the licensing portion and were not able to reach a conclusion by the end of December.  Subsequently, But because of the uncertainty created by Firsthand's threatened foreclosure on SiGen's intellectual property assets, the licensee put these discussions on hold.  If that impediment to an agreement with our licensee can be overcome, they have expressed continuation interest and, if concluded, the revenue potential of such an equipment and license agreement could be enormous.  Historically, this licensee has paid many millions as an upfront license fee, plus ongoing royalties as a percentage per product wafer sold, and I would expect the terms of any license for Sapphire and Silicon Carbide applications to be similar.

//

//

*(2) Description of SiGen's Assets*

26. At present, SiGen's assets consist of approximately $147,930 in cash, accounts receivable, a judgment obtained against a former subtenant in the amount of $462,812, patents and other intellectual property, the projected future royalty streams due under existing license agreements, and sophisticated tooling and other equipment used in SiGen's R&D operations. In addition, SiGen has become aware that certain semiconductor manufacturers are infringing upon SiGen patents.

27. I am familiar with the secondary market for the kinds of tooling and equipment owned by SiGen that are described more particularly on Exhibit F attached hereto. As a general matter, the values attributed to the equipment on Exhibit F have been derived from my knowledge of that market. For the R&D-4 Accelerator, rT-CCP, and SPA, however, my value estimate has been based upon discussions with Shin-Etsu Chemical Co., Ltd., which has expressed interest in acquiring these items from SiGen. Based upon the foregoing, , I believe that in a commercially reasonable arm's length sale, the assets listed above the subtotal line for equipment on Exhibit F could be sold for $5,848,000. .

28. SiGen also holds accounts receivable with a face amount of $1,516,060.50. Each of the account debtors are long-time customers of SiGen with good payment histories, and none dispute their obligation to pay the listed amounts to SiGen. Based thereon, I am informed and believe that SiGen will collect the full $1,516,060.50 from these entities.

29. SiGen's license agreements with Applied Materials, Inc., EV Group E. Thallner GmbH, QMAT, Inc., and Shin-Etsu Chemical Co., Ltd. provide for continued payment of royalties based upon their sales of units incorporating the licensed technology. I am familiar with the markets for the devices they sell that rely on SiGen's technology, their respective historic sales figures, and factors that will influence the volume of sales for the remaining terms of the licenses. I have projected the total sales upon which royalties would be due from just two current licensees. This analysis is based upon actual royalties paid by these licensees over the last three years, and assumed a rate of growth in their sales. In the case of one licensee, I assumed a growth rate of 20%, 15% and 10% over the next three five-year periods starting from

2015 (which coincides with the expiration of the term of the license). I believe those projected rates of growth are reasonable because historical growth rates for this licensee were 69.5%, in 2012, 141.4% in 2013, and 24.9% in 2014. Although the license agreements continue in effect for a longer period (for the duration of the patents to which they relate), my analysis shortened the revenue producing period to approximately seven years. I then discounted the future royalty streams from that truncated period using a cap rate of 10%. Based thereon, I estimate that the net present value of this licensee license agreement is $7,500,000. With respect to a second licensee, royalties over the past three years averaged $300,000 per year. I have assumed flat growth over the remaining five plus year term of the license, which would imply $1.5 million in revenue during that time period. However, to be conservative, I shortened the projected revenue producing period, and then applied a 10.0% discount rate to the resulting revenues. Based thereon, I estimate that the net present value of the second licensee license agreement is $1,000,000.

### (3) Adequate Protection

30. For the foregoing reasons, SiGen's assets that are subject to Firsthand's claimed liens have a fair market value of more than $15,864,060 ($16,411,872 if the judgment against the former subtenant is collectable). As noted, the face amount of the obligation to Firsthand (without taking into account any counterclaims or offsets SiGen holds or may hold against Firsthand) totals $7,688,182.09 as of February 28, 2015. In short, the collateral is worth twice the purported indebtedness to Firsthand.

31. Moreover, SiGen has other assets that are not encumbered by Firsthand's purported lien. As discussed above, the Molex Equipment was explicitly excluded from the security interest granted to Firsthand. The debt to J.D. Molex was repaid in late 2014, and so those assets are now unencumbered. As described on Exhibit F, I am of the opinion that the Molex Equipment is worth approximately $85,000 if sold within a reasonable time in an arm's-length sale.

32. SiGen's assets also consist of significant intellectual property infringement rights, which I have reason to believe are worth $50 million or more. SiGen has retained counsel to

prosecute these infringement rights, and after analyzing the potential infringement and the ability of the alleged infringers to respond to a judgment, it has agreed to represent SiGen on a contingent fee basis.

## II. First-Day Motions

32. The following three motions require immediate attention of the Court as a "first-day" matter: (i) motion to approve use of cash collateral (the "Cash Collateral Motion"), (ii) motion to approve the continued use of the Debtor's cash management system (the "Cash Management Motion"), and (iii) a motion to limit notice (the "Motion to Limit Notice"). I have read each of these motions and verify that the facts stated therein are true and correct to the best of my personal knowledge and/or based on my review of business records or other documents prepared by, or consultation with, employees or professionals retained on behalf of the Debtor.

### A. Cash Collateral Motion

33. As noted above, the Debtor is party to the Pre-Petition Loan Documents with Firsthand. As of the Petition Date, the purported obligation to Firsthand under the Pre-Petition Loan Documents is approximately $7.7 million. Firsthand asserts a first-priority security interest upon substantially all of the Debtor's assets to secure these obligations. As also described above, Firsthand's claimed collateral includes various accounts receivable, future revenues under existing license agreements, and equipment which I estimate have a value of approximately $15.8 million or more as of the Petition Date.

34. The Debtor has no access to cash -- other than cash collateral -- to satisfy its ongoing payroll and other business obligations which will continue to become due during this Chapter 11 case.

### B. Cash Management Motion

35. Prior to the commencement of this Chapter 11 case, the Debtor maintained three (3) bank accounts (the "Bank Accounts"). A list of the Bank Accounts is attached hereto as **Exhibit H**.

36.     The Bank Accounts consist of an operating account (the "Concentration Account"), a payroll account (the "Payroll Account") and a sweep account (the "Sweep Account"). Each of the accounts is maintained at Silicon Valley Bank.

37.     The Concentration Account comprises the core of the Debtor's cash management system. Wire receipts, automated clearinghouse transfers and checks are credited to the Concentration Account on a daily basis. The Debtor draws on the Concentration Account for all outgoing wires, automated clearinghouse transfers, and transfers to the Payroll Account, a zero balance account upon which the Debtor draws to satisfy payroll checks only. In addition, balance sweeps occur daily from the Concentration Account to the Sweep Account.

38.     The Debtor requests authority to maintain and continue to use its existing Bank Accounts in the name and with the account numbers existing immediately prior to the Petition Date. The Debtor's assets include significant accounts receivable and it is critical to maximizing the value of these assets that the receivables be collected in an orderly manner. Closing the existing Bank Accounts and reopening debtor in possession accounts would only cause confusion to the Debtor's customers and may result in funds being deposited into the wrong account, misapplied, held in limbo or otherwise delayed or lost. Further, the Debtor does not believe that maintaining existing Bank Accounts will prejudice any party-in-interest or the estate. If the relief requested herein is granted, the Debtor will not pay any debts incurred before the Petition Date.

**C.     Motion to Limit Notice**

39.     Based on my review of the SiGen's books and records, I believe that as of the Petition Date, SiGen has fewer than fifty (50) actual creditors. SiGen has, however, been in existence since 1997, and over that time, has purchased goods and services from and otherwise conducted business with roughly 1600 entities, some of whom may contend that they hold claims. Hence, all of the 1600 entities were included in the creditor matrix in order to ensure that any entity with whom SiGen has dealt would receive notice of the bankruptcy filing and be

bound by the order confirming the plan of reorganization SiGen expects will be entered in this case.

40. Absent the granting of relief, SiGen will incur a significant unnecessary expense and burden serving entities that do not consider themselves to be creditors. SiGen has proposed procedures to ameliorate these burdens. Until the Court approves this notice procedure, the Debtor's estate will incur significant and unnecessary costs associated with noticing approximately 1,600 persons and/or entities of the numerous matters arising in this case. The earlier the Debtor can implement the notice procedures, the greater the savings to the Debtor's estate and its creditors.

I declare under penalty of perjury according to the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 20th day of February, 2015 at Santa Clara, California.

*/s/ Theodore E. Fong*
Theodore E. Fong